## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

ROBERT GRADY JOHNSON,      )
                    )
       **Petitioner**      )
                    )
**vs.**                  )     **Case No. CIV-04-1602-L**
                    )
**MIKE MULLIN, Warden,**      )
                    )
       **Respondent**     )

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner appearing through counsel, brings this action pursuant to 28 U.S.C. § 2254 seeking a writ of habeas corpus. United States District Judge Stephen P. Friot referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B).[1]  A response to the petition has been filed, as well as a reply, and so the matter is at issue and ready for disposition.  For the reasons stated herein, the undersigned recommends that the petition be denied.

### I.  Procedural History

Petitioner is challenging his convictions on four counts of murder in the commission of robbery with a dangerous weapon, for which he was sentenced to life without parole on each count.[2]  Case No. CF-84-597, District Court of Comanche County. Petitioner filed his first application for habeas corpus relief in the United States District Court for the Eastern District of Oklahoma pursuant to 28 U.S.C. § 2254.  The case was

---

[1] On March 29, 2005, Judge Friot transferred this action to United States District Judge Tim Leonard for all further proceedings.

[2] Petitioner was also convicted of three counts of shooting with the intent to kill and one count of attempted shooting.  Petition, p. 2.  Although he does not directly challenge those convictions, certain of the claims raised in his petition, if accepted by the Court, would invalidate those convictions as well.

transferred to this Court on February 20, 1997.  Case No. CIV-97-234-L.  The case was dismissed without prejudice on a finding that Petitioner had not exhausted his claims in state court.  Petitioner did not appeal the judgment.

Thereafter, on October 19, 1998, Petitioner filed a second application for habeas corpus relief in this Court.  Case No. CIV-98-1453-L.  Therein Petitioner sought to compel the State of Oklahoma to permit him a direct appeal from his convictions, asserting that his constitutional right to the effective assistance of counsel was violated because his appellate attorney failed to timely file a petition in error, resulting in the dismissal of his direct appeal by the Oklahoma Court of Criminal Appeals.  This Court denied relief.  Id. On appeal, the Tenth Circuit Court of Appeals concluded that Petitioner's first application for habeas corpus relief, Case No. CIV-97-234-L, had been improperly dismissed.  Johnson v. Champion, 288 F.3d 1215, 1225-26 (10th Cir. 2002).  The Court further concluded that Petitioner was denied the effective assistance of appellate counsel and ordered that he be granted a direct appeal out of time or be released from confinement.  Johnson, 288 F.3d at 1230.

Thereafter Petitioner filed his direct appeal with the Oklahoma Court of Criminal Appeals.  Case No. F-2002-918, Oklahoma Court of Criminal Appeals.  The Oklahoma Court of Criminal Appeals affirmed Petitioner's convictions and he sought relief in this Court by filing the instant 28 U.S.C. § 2254 petition.  Petitioner did not seek post-conviction relief from either the District Court of Comanche County or the Oklahoma Court of Criminal Appeals.

Petitioner raises thirteen grounds for relief.  In Ground One, Petitioner argues that no rational jury could have concluded beyond a reasonable doubt that he was present and participating in the bank robbery.  Petition, p. 22-33.  In Ground Two, Petitioner argues that his right to a fair trial was violated by the trial court's incomplete and misleading instructions on the crime of felony murder.  Petition, p. 33-35.  In Ground Three, Petitioner argues that he was denied a fair trial by the trial court's failure to give lesser included offense instructions.  Petition, p. 35-38.  In Ground Four, Petitioner argues that his rights under the Confrontation Clause were violated when the trial court refused to permit him to refresh the recollection of a witness.  Petition, p. 38-43.  In Ground Five, Petitioner asserts that he was denied a fair trial by the court's limitation on his cross-examination of a prosecution witness.  Petition, p. 43-48.  In Ground Six, Petitioner argues that he was denied a fair trial by the prosecutor's repeated, gratuitous and prejudicial comments on his sexual orientation.  Petition, p. 48-54.  In Ground Seven, Petitioner argues that the introduction of a second knife violated his right to a fair trial.  Petition, p. 54-58.  In Ground Eight, Petitioner argues that he was denied a fair trial as a result of prosecutorial misconduct regarding a sketch of the suspect.  Petition, p. 58-61.  In Ground Nine, Petitioner argues that prosecutorial misconduct deprived him of a fair trial by the introduction of improper evidence.  Petition, p. 61-66.  In Ground Ten, Petitioner argues that he was denied a fair trial through one-sided and indefensible evidentiary rulings.  Petition, p. 66-79.  In Ground Eleven, Petitioner argues that he was denied a fair trial when a juror was targeted and removed from the jury.  Petition, p. 79-81.  In Ground Twelve, Petitioner argues that he was denied a fair trial because the trial

court refused to instruct the jury during sentencing that he could not be held accountable for co-defendant Jay Neill's actions.  Petition, p. 82-84.  In Ground Thirteen, Petitioner argues that the State's improper arguments during the sentencing phase deprived him of a fair trial.  Petition, p. 84-88.

## II. Background

On direct appeal, the Oklahoma Court of Criminal Appeals noted that the facts underlying Petitioner's convictions were set out in the direct appeal opinion of his former co-defendant, Jay Wesley Neill.  Opinion, p. 1-2.  Accordingly, unless otherwise stated herein, the following facts are taken from <u>Neill v. State</u>, 896 P.2d 537 (Okla. Crim. App. 1994).

During the Fall of 1984, Petitioner and Jay Neill shared an apartment in Lawton, Oklahoma.  Mr. Neill attempted to support the men, while Petitioner stayed home.  The men experienced financial difficulties, and therefore invited Rhonda Neff and her husband to move into the apartment to share expenses.  Rhonda Neff was to buy groceries and Mr. Neill was to pay the rent.  Eventually Mr. Neill fell behind on the rent and other bills.  Mr. Neill purchased a car in September 1984, and defaulted on his payments to General Motors Acceptance Corporation.

Petitioner and Mr. Neill had a joint checking account at the First Bank of Chattanooga, in Geronimo, Oklahoma (hereinafter "the bank"), which was not in good standing as the account had numerous checks written on it which had been returned due to insufficient funds.  The bank was a small facility, housed in a prefabricated building. It had no security cameras and no guards.

On December 12, 1984, Mr. Neill visited a local pawnshop and inquired about purchasing a gun.  He told the clerk that he had been receiving threats and needed the gun for protection.  The different types of guns were explained to Mr. Neill and he was told that he needed a permit from the police department, which required the buyer to be twenty-one years old.

On December 13, 1984, Petitioner and Mr. Neill went to the K-Mart store in Lawton.  The men first looked at guns, but after discovering that they were BB guns, the men purchased two large hunting knives.  Mr. Neill went that morning to the Lawton airport and made arrangements for the two men to travel to San Francisco at approximately 6:30 p.m. on Friday December 14, 1984.  Mr. Neill explained that he would pay for the tickets in cash on the date of travel.

At approximately 11:30 a.m. on December 13, 2004, Petitioner applied for a gun permit from the Lawton Police Department.  A witness testified that Petitioner and Mr. Neill entered the bank at approximately 1:15 p.m. on December 13, 2004, and did not conduct any business or speak with any employee, they just looked around and talked amongst themselves.

On December 14, 1984, Petitioner and Mr. Neill returned to the pawnshop and asked to see the revolver that Mr. Neill had seen the day before.  They were shown how to load and fire the gun and told the type of ammunition needed and where it could be purchased.  They indicated they would return that afternoon with the gun permit.

Petitioner picked up his gun permit from the Lawton police department shortly before 11:30 a.m. on December 14, 1984.  Petitioner and Mr. Neill returned to the pawn

shop at 12:25 p.m. to purchase the gun.  Because Petitioner was of legal age to purchase

the gun, he showed the pawn shop owner his permit and filled out the necessary forms.

Petitioner listed a post office box as his address rather than their apartment address.

Prior to purchasing the gun, Petitioner and Mr. Neill had gone to Gibson's to purchase

ammunition.  Once inside, Mr. Neill chose the ammunition while Petitioner went in

search of masking tape, which he indicated would be used to fill picture holes in the

walls of their apartment.  Again, because of his age Mr. Neill could not purchase the

ammunition, so Petitioner completed the necessary form for the transaction, listing his

former apartment as the address.  The ammunition would not fit the gun, because the

caliber of the gun had been erroneously marked on the tag at the pawnship.  At

approximately 12:30 p.m., Petitioner exchanged the ammunition for .32 caliber shells,

this time using his post office box address.

Petitioner went to the apartment of his neighbor, Debbie Ward, to use the

telephone at approximately 12:45 p.m.  She was home on a break from her work, and was

required to be at work by 1:00 p.m.  Petitioner used the telephone to contact the travel

agent.  He told the agent that Mr. Neill would be getting off work early, and they desired

an earlier flight to San Francisco, preferably one leaving at 2:30.  Petitioner and Mr. Neill

were booked on the flight, even though the change required an upgrade to first class at

a cost of $1200.00.  Petitioner did not ask about the possibility of cheaper tickets.

The First Bank of Chattanooga in Geronimo, Oklahoma, was robbed on December

14, 1984, shortly after 1:00 p.m.  According to one shooting victim, Marilyn Roach, there

were two male voices in the bank at the time of the robbery and its attendant murders

and shootings.  Petitioner contends that he was unaware of the robbery and that he was at home cleaning the apartment when Mr. Neill returned at approximately 2:00 p.m., announced that he had killed seven or eight people, and told Petitioner that they needed to leave.

Petitioner and Mr. Neill taped some of the proceeds of the robbery to their waists before leaving for the airport, where they almost missed their flight to San Francisco. Once in San Francisco Petitioner and Mr. Neill spent portions of the robbery money on shopping, dining and partying.  They were both arrested on December 16, 1984, Petitioner contending that he was unaware exactly how Mr. Neill obtained the money, although he was aware that Mr. Neill was attempting to cash a forged check he had stolen from Rhonda Neff before they had left Oklahoma.

Additional facts will be set forth herein as necessary to Petitioner's specific propositions of error.

### III. STANDARD GOVERNING PETITIONS FOR HABEAS CORPUS

For factual and legal issues that have already been adjudicated in state court, the Court may only grant a writ of habeas corpus if that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1) and (2).

A state court's determination is contrary to clearly established federal law where it applies a rule that contradicts the law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court's determination involves an unreasonable application of clearly established Supreme Court precedent if it identifies the correct governing legal principle from the Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Id. at 413; see also Wiggins v. Smith, 539 U.S. 510, 518-519 (2003). It is not enough that the state court applied clearly established federal law erroneously or incorrectly; the application must also be unreasonable. Williams, 529 U.S. at 410-11; Valdez v. Bravo, 373 F.3d 1093, 1096 (10th Cir.), cert. denied, 543 U.S. 1008 (2004). Further, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). That presumption of correctness is rebuttable only "by clear and convincing evidence." Id.

## IV.  DISCUSSION

### A.  GROUND ONE

In Ground One, Petitioner argues that his conviction for murder is unconstitutional because no reasonable trier of fact could have found him guilty beyond a reasonable doubt in that there was no evidence that he actively participated in the robbery of the bank.  On direct appeal the Oklahoma Court of Criminal Appeals noted that Petitioner's presence in the bank at the time of the robbery was the subject of controversy.

8

> The State's evidence showed [Petitioner] participated in the planning and commission of the robbery/homicides. [Petitioner] took the witness stand and denied being in the Bank and participating in the robbery/homicides.
>
> A conviction for felony-murder requires that the accused must have committed murder while in the commission of one of the enumerated felonies found in 21 O.S.Supp.1982, § 701.7(B).  All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals and are equally culpable with other principals.  21 O.S.1991, § 172.  See also Conover v. State, 933 P.2d 904, 910-11 (Okla.Cr. 1997) Mere presence or acquiescence, without participation, does not constitute a crime. Id.  However, only slight participation is needed to change a person's status from a mere spectator into an aider and abettor.  Id.  "Aiding and abetting in a crime requires the State to show the accused procured it to be done, or aids, assists, abets, advises or encourages the commission of the crime."  Id. quoting Hindman v. State, 647 P.2d 456, 458 (Okla.Cr. 1982).

Opinion, p. 2-3.  After summarizing the evidence presented against Petitioner, the Oklahoma Court of Criminal Appeals concluded:

> This evidence showed [Petitioner] fully participated in the planning and execution of the robbery/homicides.  Although [Petitioner] was not identified by any witnesses as being inside the Bank with Neill, his conduct leading up to the robbery/homicides, and his conduct after the crimes, creates a reasonable inference that his was the other voice heard by Marilyn Roach inside the bank.  This evidence is sufficient to find [Petitioner] guilty as a principal to felony-murder.

Opinion, p. 8-9.  The Oklahoma Court of Criminal Appeals continued by addressing Petitioner's argument that "the aider and abettor rule cannot be aggregated with the felony murder rule to allow a conviction for felony-murder when the defendant was not present during the commission of the underlying felony."  Opinion, p. 9.  In rejecting this argument the Oklahoma Court of Criminal Appeals noted that the aider and abettor rule has been applied to the get-away car driver in a felony murder case, even though the

9

driver had not entered the premises to participate in the assault on the victim. Opinion, p. 9-10.

Petitioner contends that the Oklahoma Court of Criminal Appeals' decision was contrary to or an unreasonable application of <u>Jackson v. Virginia</u>, 443 U.S. 307, 315-16 (1979). In reviewing the sufficiency of the evidence for purposes of habeas corpus relief, <u>Jackson</u> provides that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." <u>Id.</u> at 319; <u>see</u> <u>also</u> <u>Romano v. Gibson</u>, 239 F.3d 1156, 1164 (10th Cir. 2001). In applying this standard, the reviewing court may not weigh conflicting evidence or consider the credibility of witnesses. <u>Grubbs v. Hannigan</u>, 982 F.2d 1483, 1487 (10th Cir. 1993). Rather, the court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." <u>Id.</u>

An even more limited review is required by 28 U.S.C. § 2254(d) where, as here, a habeas petitioner's sufficiency of the evidence challenge has already been decided on the merits in state court. <u>Valdez v. Ward</u>, 219 F. 3d 1222, 1237 (10th Cir. 2000). Pursuant to § 2254(d), Petitioner is not entitled to relief unless the Oklahoma Court of Criminal Appeals' determination that there was sufficient evidence was unreasonable. <u>Torres v. Mullin</u>, 317 F.3d 1145, 1151 (10th Cir. 2003). "That amounts to deference squared." <u>Torres v. Lytle</u>, No. 03-2098, 2004 WL 103557 at *2 (10th Cir. Jan. 23, 2004).[3]

In determining whether the Oklahoma Court of Criminal Appeals was reasonable in finding the evidence sufficient to support Petitioner's convictions, the Court must start

---

[3]This and any other unpublished disposition are cited for persuasive authority pursuant to Tenth Circuit Rule 36.3.

with Oklahoma law defining the substantive elements of the crime.  Jackson, 443 U.S. at 324 n.16.  The version of Okla. Stat. tit. 21 § 701.7B in effect in 1984,  provided in pertinent part:

> A person ... commits the crime of murder in the first degree when he takes the life of a human being, regardless of malice, in the commission of ... robbery with a dangerous weapon.

In reviewing this claim the undersigned has made a thorough review of the entire transcripts.  This review combined with the requirement that the Court construe the facts in the light most favorable to the prosecution reveals the following evidence of Petitioner's guilt:

In the days leading up to the December 14, 1984 robbery of the First Bank of Chattanooga, Petitioner and Mr. Neill embarked on a course of action that would end with their arrest in San Francisco on December 16, 1984.  Despite having no money in their joint checking account and facing eviction and the repossession of a car recently purchased by Mr. Neill, the two men went on a spending spree on Sunday, December 9, 1984.  Together they chose clothing and jewelry from a department store, purchasing in excess of $900.00 worth of items by writing a check that they knew their account could not cover.  While shopping Mr. Neill asked the clerk, who was also a travel agent, about trips to the Bahamas and San Francisco.

On the next night, without having deposited any funds into their account, Petitioner and Mr. Neill dined at Red Lobster, paying their bill with a check that could not be honored.  Over dinner at Red Lobster on that night, December 10, 1984, Mr. Neill mentioned his plan to rob the First Bank of Chattanooga, a plan he had mentioned in

November 1984, to Petitioner and a friend over dinner.  On Wednesday December 12, 1984,  Mr. Neill selected a gun from a pawn shop, but he could not purchase it because of his age.  Petitioner and Mr. Neill again dined at Red Lobster, paying with a bad check.

At approximately 11:30 a.m. on December 13, 1984, Petitioner went to the Lawton Police Department and applied for a gun permit, providing a post office box in support of his application rather than his residential address, and stating that he lived alone in an apartment as the reason he wanted to obtain a gun.[4]  Mr. Neill was at the Lawton Airport on Thursday, making travel plans for he and Petitioner to go to San Francisco. He informed the travel agent that he would pay for the trip with cash upon their departure.  Both men were seen at the bank at 1:30 p.m., one day before the robbery at the approximate time of the robbery, looking around but not conducting any business. At 2:00 p.m., Mr. Neill and Petitioner went to K-Mart and looked at guns.  Upon learning that the guns were only BB guns, the men purchased two hunting knives, again using a bad check.

On Friday December 14, 1984, at approximately 10:00 a.m., Petitioner and Mr. Neill went to the pawn shop and Mr. Neill asked the shop owner to hold the gun that he had selected on Wednesday.  Petitioner returned to the Lawton Police Department and retrieved his gun permit.  Petitioner and Mr. Neill went to Gibson's, a local sporting goods store,where they purchased ammunition for a .38 caliber gun and a roll of masking tape. The men then returned to the pawn shop with Petitioner's gun permit and purchased the

---

[4] Petitioner informed Agent Knowlton of the Federal Bureau of Investigation that Mr. Neill had told him on Thursday of his plan to rob a bank and asked that he obtain a gun permit and gun for Mr. Neill to use in the robbery.

.32 caliber gun that had been held back, which had mistakenly been labeled as a .38 caliber.  Shortly thereafter Petitioner ran back into Gibson's in a "tremendous hurry," to exchange the ammunition for the proper size.

Shortly before 1:00 p.m. Petitioner telephoned the travel agent from his neighbor's apartment and told the agent to change the reservations to an earlier flight, stating that money was no object and that payment would be made upon their arrival at the airport. Petitioner told the agent that Mr. Neill would be getting off work early that day.

The bank was robbed at approximately 1:30 p.m.  Three bank employees, Kay Bruno, Joyce Mullenix, and Jeri Bowles were stabbed to death, with more than seventy stab wounds, with several of those wounds described as "decapitation" type wounds. One of the knives purchased by Petitioner and Mr. Neill was found in the bank with blood on its handle consistent with that of Kay Bruno.  The other knife was found in Mr. Neill and Petitioner's car at the Lawton Airport, visible from outside the car on the passenger side.  It too contained blood consistent with Ms. Bruno and with one of the other victims.  Ralph Zeller was killed during the robbery by two gunshot wounds to the head.  Marilyn Roach, Bellen Robles and her husband, Ruben Robles, were shot, although their wounds were not fatal.

The gun used in the robbery was identified as the one Petitioner purchased from the pawn shop on December 14, 1984.  Marilyn Roach testified that she heard two voices during the robbery, one stating "I thought I told you not to shoot anybody."  The other responding, "well they moved."  Bellen Robles testified that she heard the cash drawers opening and closing within seconds of the last shot being fired.  Herman Williams, a

13

jailhouse informant, testified that Petitioner told him that Petitioner and Mr. Neill had planned the robbery and murders, intending that there would be no survivors.

At their apartment, Petitioner and Mr. Neill taped some of the proceeds of the robbery to their bodies, using the masking tape purchased by Petitioner earlier that day. Petitioner, accompanied by Mr. Neill, discarded the gun in a pond in Lawton, en route to the airport.  Neither man was distraught at the Lawton Airport, where they paid cash for their first class tickets to San Francisco and conversed with a travel agent, the one who also worked at the department store.  Once in San Francisco the men spent some of the proceeds of the robbery on shopping and entertainment.  Some of the money from the robbery was recovered from their hotel room when they were arrested on December 16, 1984.

These facts, taken together, are sufficient to support a finding that Petitioner was present during the course of the robbery of the bank and participated in the robbery and murders.[5]  Accordingly, the Oklahoma Court of Criminal Appeals' application of <u>Jackson</u> was not unreasonable, and habeas corpus relief should be denied on this claim.

Furthermore, regardless of whether there was sufficient evidence to establish that Petitioner was present in the bank and participating in the robbery, there was sufficient evidence to find him guilty as an aider and abettor.  Petitioner contends that the Oklahoma Court of Criminal Appeals erred in its consideration of this aspect of his case,

---

[5] Petitioner makes reference to the testimony by Karen Nobis' mother-in-law regarding a statement by Karen Nobis, the juror removed between the guilt phase and the penalty phase of Petitioner's trial, that no juror believed Petitioner was in the bank at the time of the robbery.  Tr. Vol. IX, p. 2552.  There was no admissible evidence of any such conclusion presented either during trial or in any subsequent proceedings.

because no person has ever been held responsible for felony murder without being physically present at the scene of the crime.

Oklahoma law designates as a principal any person who aids and abets in the commission of a crime.  Okla. Stat. tit. 21 § 172.  The Oklahoma Court of Criminal Appeals is free to determine that aiding and abetting a robbery that culminates in murder is sufficient to hold a person liable as a principal in the felony murder premised on that robbery.  It is not this Court's role to challenge the Oklahoma Court of Criminal Appeals' interpretation of Oklahoma law.  The Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  Bradshaw v. Richey, _ U.S. _, 126 S.Ct. 602, 604 (2005).  Although Petitioner cites to numerous cases holding people liable who were actually present during the underlying felony, none of the Oklahoma cases addressed the question raised herein.  Accordingly, Petitioner's reliance on these factually distinguishable cases does not support the granting of habeas corpus relief.

In addition to the evidence set forth above, the Oklahoma Court of Criminal Appeals also noted the following facts in support of Petitioner's guilt:

> [I]n mid-November 1984, co-defendant Neill, with [Petitioner] standing next to him, told a friend they were going to rob the Bank because it did not have any security cameras or guards.
>
> Prior to December 1984, [Petitioner] told several friends of the severe financial problems he and Neill were experiencing. The week before the crimes, [Petitioner] appeared to his neighbors to be nervous and upset. On Sunday December 9, [Petitioner] and Neill purchased over $900.00 worth of clothes and jewelry.  The next night, [Petitioner] and Neill went to

dinner at a local restaurant.  Neill again mentioned robbing the Bank as a
way to solve their financial problems.

Opinion, p. 3-4.  In conjunction with the evidence set forth above, it is clear that there

was ample evidence presented to hold Petitioner liable as an aider and abettor in the

robbery during which the four murders occurred.

In this context the case is similar to Chaney v. Brown, 730 F.2d 1334 (10th Cir.

1984).  Mr. Chaney challenged his first degree murder conviction on the theory that

exculpatory evidence was withheld in violation of his rights under Brady v. Maryland,

373 U.S. 83 (1963).  Mr. Chaney argued that the evidence was exculpatory because

certain of the statements given to investigating agents indicated that another person

might be involved in the murder for which he had been convicted.  The Tenth Circuit

concluded that the evidence was not exculpatory with regard to Mr. Chaney's guilt,

because it merely indicated that another person or persons might be involved,not that he

was innocent.

> Considering the theory of responsibility under the aider and abettor statute,
> together with the Oklahoma felony murder statute, the conviction of
> Chaney for first degree murder is supported by Oklahoma law and by the
> strong circumstantial evidence showing Chaney's participation at least as
> an aider and abettor in the kidnapping, during which Mrs. Ashmore's
> murder occurred

Chaney, 730 F.2d at 1350 (citations omitted).  The facts in the light most favorable to the

prosecution and set forth above were sufficient to hold Petitioner liable for the robbery

of the bank and the murders committed in the course thereof, even without any evidence

that he was present at the Bank.

Finally, Petitioner's attempt to challenge the validity of the Oklahoma Court of Criminal Appeals interpretation of Oklahoma's felony murder statute is without support. The undersigned questions whether this claim, which is in response to the Oklahoma Court of Criminal Appeals' decision on direct appeal, has been fairly presented to that Court for consideration. Essentially Petitioner contends that he did not have adequate notice as required by the federal constitution that his alleged conduct would amount to felony murder. Petition, p. 31-33. Notwithstanding Petitioner's arguments to the contrary, the plain language of the felony murder statute and the aiding and abetting statute give sufficient notice that his actions were criminal and would amount to felony murder.

Accordingly, the undersigned recommends that habeas corpus relief be denied on Ground One because Petitioner has not established that the Oklahoma Court of Criminal Appeals' decision on this issue was contrary to or an unreasonable application of Jackson.[6] Accordingly, habeas corpus relief should be denied on Ground One.

## B.  GROUND TWO

In Ground Two, Petitioner argues that the trial court's instructions to the jury were legally insufficient. Specifically, Petitioner asserts that the jury should have been

---

[6] Petitioner's reliance on Anderson v. State, 91 P.2d 794 (Okla. Crim. App. 1939), is misplaced. In Anderson, the Court noted that

a mere mental assent to or acquiescence in the commission of a crime by one who did not procure or advise its perpetration, who takes no part therein, gives no counsel and utters no word of encouragement to the perpetrator, however wrong morally, does not in law constitute such person a participant in the crime.

Id. at 797 (citations omitted). In this case there is ample evidence that Petitioner took part in the robbery through its preparation and the facts attendant thereto.

instructed that he could not be found guilty of murder unless the State proved beyond a reasonable doubt that he was present at the bank during the robbery.

A petitioner seeking collaterally to attack a state court conviction based on an erroneous set of jury instructions "bears a heavy burden of proof." Shafer v. Stratton, 906 F.2d 506, 508 (10th Cir. 1990). "Habeas proceedings may not be used to set aside a state conviction on the basis of erroneous jury instructions unless the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in the constitutional sense," Id. at 508 (quotation omitted), or "so infected the entire trial that the resulting conviction violates due process,'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).

Petitioner's Ground Two argument is entirely dependent on his first claim for relief, because he argues that the jury instructions did not require that the jury find that he was present at the bank at the time of the robbery. Because Petitioner is not entitled to relief on Ground One, he is similarly not entitled to relief on this ground. The jury instructions properly informed the jury regarding the elements the State was required to prove in order for the jury to find Petitioner guilty. Accordingly, the undersigned recommends that habeas corpus relief be denied on Ground Two.

**C.  GROUND THREE**

In Ground Three, Petitioner contends that the Oklahoma Court of Criminal Appeals' determination that he was not entitled to lesser included offense instructions on bank robbery was contrary to or an unreasonable application of Beck v. Alabama, 447

U.S. 625 (1980).  In his reply brief, Petitioner raises a new argument, asserting that he is entitled to relief pursuant to Hill v. United States, 368 U.S. 424 (1962).

Respondent contends that this issue was not fairly presented to the Oklahoma Court of Criminal Appeals because Petitioner did not cite to Beck.  Respondent did not have an opportunity to address Petitioner's reliance on Hill or to argue that Petitioner has not exhausted that claim. The undersigned need not address the issue of exhaustion, because Petitioner's claim lacks merit regardless of whether he relies on Beck or Hill to support his claim that the trial court's failure to instruct the jury on the lesser included offense of robbery violated his constitutional rights.  See 28 U.S.C. § 2254(b)(2).

Petitioner's attempt to rely on Beck has been squarely foreclosed by the Tenth Circuit Court of Appeals' decision in Trujillo v. Sullivan, 815 F.2d 597 (10th Cir. 1987). In Trujillo, the Court held that "the capital case in which the death penalty is not ultimately imposed appears to be more like the noncapital case than the death sentence case in which eighth amendment values are clearly implicated; unless the defendant is actually sentenced to death, the eighth amendment is not directly implicated." Id. at 602. The Court concluded that Beck is a case grounded in the Eighth Amendment, and that it has no place in non-capital cases.  Although Petitioner takes issue with the Tenth Circuit's determination that a case in which the State seeks the death penalty is not a capital case for habeas corpus purposes unless a death sentence is imposed, this Court is not free to review that decision.  This Court may not depart from controlling legal authority clearly set forth in a published decision of the Tenth Circuit Court of Appeals. See United States v. Spedalieri, 910 F.2d 707, 709 n. 2 (10th Cir. 1990)("[a] district court

must follow the precedent of this circuit")(citations omitted).  Accordingly, the Oklahoma Court of Criminal Appeals' decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent as set forth in Beck and Petitioner is not entitled to relief on this basis.

When confronted with Trujillo, Petitioner shifts his reliance to Hill, cited by the Court in Trujillo as providing a due process basis for challenging a trial court's failure to instruct the jury on lesser included offenses.  Trujillo, 815 F.2d at 603.  As the Tenth Circuit subsequently noted, "[u]nder Trujillo, this is a *non* capital conviction to be affirmed unless 'the evidence so overwhelmingly supports a lesser included offense instruction' that its absence was a 'fundamental miscarriage of justice.'"  Turner v. Champion, No. 97-6018, 1997 WL 740794, *2 (10th Cir. Dec. 2, 1997)(quoting Trujillo, 815 F.3d at 603-04).  In this case, however, the failure to give the instructions was not a fundamental miscarriage of justice.

This conclusion rests, in part, on the recommendation made above with regard to Petitioner's first argument.  Petitioner would have this Court conclude that despite having fully participated in the planning and preparation for a robbery, that he could only be held responsible for the robbery and not for its attendant murders.  However, before lesser included offense instructions are mandated by the due process clause and Hill, the Court must conclude that had such instructions been given, the jury rationally could have acquitted Petitioner of the greater offense and found him guilty of the lesser offense. See Keeble v. United States, 412 U.S. 205 (1973).  Under the facts of this case, and likely most cases challenging a felony murder conviction based on a robbery, such a conclusion

is not possible.  Petitioner was found guilty of felony murder based on robbery, because in the course of the robbery in which he was a participant, people were killed.  As noted repeatedly above, there is no requirement under Oklahoma law that a person be physically present at the time of the murders to be held criminally responsible.  Here, to find Petitioner guilty of robbery but to acquit him of felony murder would have required the jury to employ a legal fiction.  There is no evidence that the deaths inside of the bank did not occur during the commission of the robbery.  Thus, to be involved in this particular robbery was to be involved in the murders.  Felony murder is a general intent crime, the robbery and the deaths in the course thereof are the key elements.  See Kinchion v. State, 81 P.3d 681, 686 (Okla.Crim.App. 2003)(Chapel, J, dissenting)(the primary function of the felony murder statute is to "remove the State's burden of proving malice by imputing the intent involved in the commission of the felony to the commission of the homicide.").  Even accepting Petitioner's theory that he did not anticipate the deaths does not remove culpability, because after purchasing a gun and knives and permitting Mr. Neill to take those with him to the bank, the death of bank workers and customers was foreseeable.  Accordingly, because the jury could not have acquitted Petitioner of felony murder while at the same time finding him guilty of robbery, Hill and the due process clause did not require that the judge instruct the jury on robbery.  Petitioner has not established that the Oklahoma Court of Criminal Appeals' decision was contrary to or an unreasonable application of clearly established Supreme Court law.  Accordingly, the undersigned recommends that habeas corpus relief be denied on Ground Three.

### D.  GROUND FOUR

In Ground Four, Petitioner argues that his rights under the Confrontation Clause were violated because the trial court refused to allow defense counsel to refresh Debbie Ward's recollection with her prior testimony.  On direct appeal the Oklahoma Court of Criminal Appeals acknowledged that the trial court committed error, but concluded that the error was harmless.  Opinion, p. 19-21.

Debbie Ward was Petitioner's across-the-hall neighbor in the apartment complex. On the date of the bank robbery Petitioner went to her apartment to use the telephone. At Mr. Neill's second trial, held before Petitioner's retrial, Ms. Ward apparently testified that she left her apartment, and that Petitioner walked out with her at a few minutes after 1:00 p.m.  At Petitioner's second trial she testified that they left "real close to 1:00 o'clock" p.m.  Tr. Vol. V, p. 1427.  She confirmed that it could have been 12:55 p.m., testimony she had given at a previous time.  Tr. Vol. V, p. 1427.  Defense counsel sought to challenge the testimony at Petitioner's trial with her earlier testimony

> Q: (defense counsel) And do you recall that Mr. Schulte asked you this referring to the afternoon of Friday, December 14, 1984.  "What time did you leave to go back to work, as best you can recall."  Do you recall that he asked you that?
> A: Yes.
> Q: Do you recall that you responded I probably left the apartment about two or three minutes after 1:00 o'clock.  Do you recall that you said that?
> A: No, I don't recall saying that.
> Q: You don't recall that you said that?
> A: No, I don't.
> Q: Okay.  Would it refresh your recollection if I showed you the transcript?
> A: Sure.

Tr. Vol. V, p. 1435.  When defense counsel sought to approach the witness the prosecutor objected, because the witness did not recall her testimony after hearing it read by

counsel.  Tr. Vol. V, p. 1435.  The judge sustained the objection.  Tr. Vol.  V, p 1435-36.

As noted, the Oklahoma Court of Criminal Appeals concluded that pursuant to

Oklahoma's evidentiary rules that counsel should have been permitted to refresh the

witness' memory regarding her testimony.  Petitioner argued on direct appeal, as he does

here, that the timing of his visit to Ms. Ward's apartment was a critical issue, because

based on her testimony at Mr. Neill's trial, Petitioner would not have had time to get to

the bank by 1:15 to 1:30 p.m., the time of the robbery.  Her testimony at Petitioner's trial

increased his travel time by a few minutes, which he asserts would have made a

difference in his ability to travel the distance between his residence and the bank.

As the Oklahoma Court of Criminal Appeals noted, this issue is only critical if

Petitioner's conviction rises and falls on his presence at the bank at the time of the

robbery.  However, as concluded above, and as found by the Oklahoma Court of Criminal

Appeals, Petitioner's presence during the actual robbery was not required in order for

him to be held liable under Oklahoma law.  Because the Court had found that Petitioner

"can legally be held criminally liable for the robbery/homicides even if he had not been

in the Bank at the actual time of the robbery/homicides," it concluded that Petitioner was

not prejudiced by the trial court's error.  Opinion, p. 20-21.

In addressing Petitioner's claim, the undersigned notes that the Oklahoma Court

of Criminal Appeals did not apply the harmless error standard of <u>Chapman v. California</u>,

386 U.S. 18, 24 (1967), or <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), but rather

concluded that Petitioner had not established that he was prejudiced by the error.  This

does not undermine the undersigned's confidence in the Oklahoma Court of Criminal

Appeals' decision, which was premised not on the Confrontation Clause of the federal Constitution, but rather on Oklahoma statutory law.  Because the Oklahoma Court of Criminal Appeals did not utilize the federal harmless error standard, however, this Court must, if it finds an error of constitutional magnitude, apply the standard set forth in Brecht.  See Penry v. Johnson, 532 U.S. 782 (2001)(a federal habeas court is to apply the Brecht standard to a habeas petition governed by the AEDPA even when the state court has not assessed a constitutional error for harmlessness under Chapman).  Pursuant to Brecht, habeas corpus relief is warranted only if the error has "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  With that standard in mind, the undersigned turns to the substantive issue.

"Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights."  Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir.1999)(citing Estelle, 502 U.S. at 67-68).  Accordingly, the fact that the trial court erred under Oklahoma law does not answer the Confrontation Clause issue.

> "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about ... harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).  Generally, "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness."  Id. at 680, 106 S.Ct. at 1436.

Matthews v. Price, 83 F.3d 328, 332-33 (10th Cir. 1996).  Here, Petitioner is arguing about the inconsistencies in Ms. Ward's testimony.  Although counsel was not permitted to

question Ms. Ward by utilizing her prior testimony, it is clear from the record that the jury was made aware that her testimony regarding the time she left her apartment on December 14, 1984 had not been entirely consistent. Petitioner's counsel was permitted to ask Ms. Ward if she recalled telling counsel that she was a few minutes late that day when she returned to work from lunch. Tr. Vol. V, p. 1437. She responded affirmatively, noting that she remembered telling him that she was a few minutes late. Tr. Vol. V, p. 1437-38. Accordingly, although the Oklahoma Court of Criminal Appeals concluded that the trial court's refusal to permit Petitioner's counsel to utilize Ms. Ward's prior testimony to refresh her recollection was error under state law, Petitioner has failed to establish that it violated his rights under the Confrontation Clause because he was permitted to establish that Ms. Ward's recollection about the timing of her return to work on that day was unclear.

Furthermore, even assuming that the trial judge's erroneous ruling implicated Petitioner's rights under the Confrontation Clause, the undersigned concludes that the limitation did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Because Petitioner's physical presence in the bank was not required in order for the jury to find him guilty, by virtue of his earlier participation, e.g. his purchase of the knives, acquisition of the gun permit, purchase of the gun and ammunition, the trial court's ruling that precluded counsel from refreshing Ms. Ward's recollection did not have a substantial and injurious effect or influence the verdict. Accordingly, Petitioner is not entitled to habeas corpus relief on Ground Four.

### E. GROUND FIVE

In Ground Five, Petitioner argues that the trial court violated his rights under the Confrontation Clause by refusing to permit his counsel to cross-examine Steven Murphy with the testimony of Denise Donahue on the issue of whether Jay Neill and Petitioner were in the bank the day before the robbery, casing the bank. Steven Murphy maintained an insurance office inside the bank. He testified that he saw Petitioner and Mr. Neill enter the bank at 1:20 p.m. on December 13, 1984, the approximate time of the robbery the next day. Tr. Vol. V, p. 1401-02, 1404. Petitioner's counsel sought to cross-examine Mr. Murphy with the testimony of Ms. Donahue, the employee at the airport who booked the trip for Mr. Neill and Petitioner. Tr. Vol. V, p. 1409. According to Ms. Donahue's testimony Mr. Neill was alone at the airport making the trip arrangements, and his tickets were processed at 12:55 p.m. Tr. Vol. IV, p. 1165. The trial court refused Petitioner's attempt to challenge Mr. Murphy's testimony with Ms. Donahue's earlier testimony. Tr. Vol. V, p. 1409.[7]

---

[7]Petitioner's counsel propounded the following question to Mr. Murphy:

> Q:      Defendant's Exhibit 47 is a photostat of a flight reservation that Jay Neill made on December 13. I would show you that it shows the transaction for completing making those flight reservations was completed at 12:55 p.m. This evidence was offered through a woman Denise Donahue. My question to you would be this, sir. If on Friday of this week -- I believe she testified last week -- I believe Ms. Donahue testified that she completed making Neill's flight reservations by 12:55 p.m. and if she further testified that he remain (sic) with her for forty-five minutes to an hour ---

Tr. Vol. V, p. 1408-09. The Court sustained an objection to the question. The Court concluded that counsel was not correctly summarizing Ms. Donahue's testimony. Tr. Vol. V, p. 1409. The discussion continued outside the presence of the jury after the court reporter read the controverted testimony. Tr. Vol. V, p. 1410-11. The Court sustained the objection, finding that Ms. Donahue's testimony was not accurately characterized. Tr. Vol. V, p. 1411.

In considering the claim on direct appeal the Oklahoma Court of Criminal Appeals summarized Denise Donahue's testimony, that Neill had arrived at around 11:00 a.m., that the reservations were entered into the computer at 12:55 p.m., and that at some point in their conversation Mr. Neill and Ms. Donahue had discussed hotels and limousine service.  Opinion, p. 17.   The Court noted that Ms. Donahue estimated she spent 45 minutes to an hour with Mr. Neill after making the flight arrangements, but then she acknowledged that her prior testimony was consistent that Mr. Neill arrived at 11:00 a.m. and remained with her for about two hours.   After reviewing the evidence the Oklahoma Court of Criminal Appeals concluded that the trial court's ruling did not violate Petitioner's rights under the Confrontation Clause or his due process rights.  Opinion, p. 17-18.

> Both Ms. Donahue and Mr. Murphy testified and were subject to cross-examination by defense counsel.  Their individual testimonies, including any inconsistencies, were before the jury for their consideration.  The right of cross-examination does not extend to asking one witness to comment on the veracity of another witnesses' trial testimony.  The inconsistency in the testimony of witnesses is the subject of closing argument by counsel, not a proper subject for cross-examination.  Further, no relevant or material evidence was excluded by the court's limitation of cross-examination.

Opinion, p. 18.  Petitioner contends this ruling was in error, because cross-examination is the principal method for determining the credibility of witnesses.

Petitioner is correct in his general assertion of the law.  Indeed, Mr. Murphy was subject to strong cross-examination by Petitioner's counsel.  However, as noted above, a criminal defendant does not have an unlimited right to cross-examine witnesses and the right of the cross-examination Petitioner sought to utilize in trial was not directed at determining whether Mr. Murphy had a motive for lying.  Petitioner sought to have one

witness comment on the veracity of another witness, with no basis for knowledge of how the other witness had testified.  Mr. Murphy and Ms. Donahue are not alleged to have known one another or to have both been present during a single interaction with Petitioner or Mr. Neill.   As the Oklahoma Court of Criminal Appeals noted, the discrepancies in the testimony of Ms. Donahue and Mr. Murphy was a topic more appropriate for closing argument.   Regardless, the relative credibility of one witness versus another is a province for the jury, which was appropriately instructed on how to assess the credibility of witnesses, and it was abundantly clear from the testimony presented that a conflict existed between Mr. Murphy's testimony and that of Ms. Donohue regarding where Mr. Neill was on Thursday December 13, 1984 at approximately 1:20 p.m, a conflict that was for the jury to resolve.

In light of the jury's role as arbiter of credibility and the fact that both Mr. Murphy and Ms. Donohue were subject to cross-examination designed to determine their veracity, the undersigned concludes that the limitation on cross-examination of Mr. Murphy did not render his trial fundamentally unfair.   Petitioner has not established that the Oklahoma Court of Criminal Appeals' decision in this regard was contrary to or an unreasonable application of clearly established federal law, and accordingly, the undersigned recommends that habeas corpus relief be denied on Ground Five.

### F.  GROUND SIX

In Ground Six, Petitioner argues that he was deprived of a fair trial because of the prosecutor's "repeated, gratuitous, and prejudicial comments on his sexual orientation." Petitioner's Brief, p. 48.  Petitioner complains that the prosecutor infected the trial by

28

referring to the fact that Mr. Neill and Petitioner went to a gay area of San Francisco. Tr. Vol. IV, p. 987. Petitioner further complains about comments by the prosecutor that the men went to gay bars and planned to stay at a gay hotel. Tr. Vol. V, p. 1484, Vol. VIII, p. 2122. Petitioner contends that these comments rendered his trial unfair.

Not every improper or unfair remark made by a prosecutor will amount to a federal constitutional deprivation. See Caldwell v. Mississippi, 472 U.S. 320, 338 (1985) (plurality). A prosecutor's improper comment or argument warrants habeas corpus relief only where the remark "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 645, (1974).

The comments about which Petitioner complains are three comments in a trial that lasted from July 12 until July 28, 1993. Specifically, Petitioner complains that the prosecutor referenced Petitioner and Mr. Neill going to a "gay area" of San Francisco, to "gay bars" and staying at a "gay hotel."

The undersigned finds that these isolated comments in a trial this long did not deprive Petitioner of his constitutional rights. Petitioner's strategy throughout this trial was to show that he was the submissive member of a homosexual couple and that Mr. Neill, the dominant member, directed his actions both before and after the robbery. This strategy is evident from Petitioner's attorneys' questioning during voir dire, from their opening statement, and from their examination and cross-examination of witnesses during trial.

In <u>Neill v. Gibson</u>, 278 F.3d 1044 (10th Cir. 2001), the Tenth Circuit found certain comments regarding Mr. Neill's sexuality to be inflammatory and unnecessary. However, the comments about which Mr. Neill complained in his habeas corpus proceeding were of a different tone. In <u>Neill</u>, the prosecutor's comments were made during the death penalty closing argument and sounded like an argument in favor of the death penalty based on Mr. Neill's sexuality. The prosecutor argued to the jury that they were "deciding life or death on a person that's a vowed (sic) homosexual." <u>Id.</u> at 1060. The Tenth Circuit found that this comment and other similar ones that were much more inflammatory than those about which Petitioner complains did not deprive Mr. Neill of a fair trial. <u>Id.</u> at 1062. Notably, with regard to complaints by Mr. Neill regarding the prosecutor's comments that he was acting out of fear, including fear of losing his relationship with Petitioner, the Court ruled that the comments were accurate in light of the evidence and relevant to the theory of the defense. <u>Id.</u> at 1060.

In light of the nature of the defense proffered by Petitioner, the undersigned cannot conclude that the comments about a gay portion of the city, gay hotels and gay bars so infected the trial with unfairness as to make Petitioner's conviction a denial of due process. Accordingly, the undersigned recommends that habeas corpus relief be denied on Ground Six.

### G.  GROUND SEVEN

In Ground Seven, Petitioner argues that his right to a fair trial was violated by the State's introduction of a second "bloody" knife. Petitioner contends that the medical examiner took a knife that was clean when it was retrieved from the scene of the bank

on the day of the murder and inserted it into one of the victim's bodies.  When the knife was sent to the Federal Bureau of Investigation laboratory in Washington, D.C., it was tested for blood and the blood found was consistent with that of one of the victim's. Petitioner contends that the introduction of the knife was prejudicial because it permitted the jury to conclude that there were two people at the bank, when in fact, the medical examiner admitted that he had exposed the second knife to the victim's blood.

On direct appeal, the Oklahoma Court of Criminal Appeals noted the history regarding the knife and the dispute at trial regarding its admissibility.  To summarize, the trial court conducted a bench conference where Petitioner's counsel argued that the evidence raised serious questions regarding the integrity of the testing of the knife and the chain of custody.  Tr. Vol. VI, p. 1550-54.  The trial court permitted introduction of the knife, concluding that there was no question that the knife was found at the bank, and thus it was admissible. Tr. Vol. VI, p. 1554.   The Oklahoma Court of Criminal Appeals concluded:

> Here the State's evidence showed the knife was substantially in the same condition at the time of offering as when it was found in the Bank.  At best, the record offers only speculation that the knife might have been tampered with prior to its examination by the FBI.  Therefore, the trial court properly admitted the evidence with any doubts going to the weight to be given the evidence by the jury.  Accordingly, this assignment of error is denied.

Opinion, p. 36.

"Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir.1999)(citing Estelle, 502 U.S. at 67-68).   Federal courts may not interfere with state evidentiary rulings unless the rulings in question rendered "the trial

so fundamentally unfair as to constitute a denial of federal constitutional rights." <u>Tucker</u> <u>v. Makowski</u>, 883 F.2d 877, 881 (10th Cir.1989)(quotations and citations omitted).

There were two knives associated with the bank robbery.  One knife, the source of the controversy, was found at the bank by Agent Arnold Bentz of the Oklahoma State Bureau of Investigation.  Tr. Vol. V, p. 1450, 1459.  Agent Bentz testified that when he recovered the knife there was blood on the handle, but he did not see any on the blade. Tr. Vol. V, p. 1467.  The second knife was found in Mr. Neill's car at the Lawton airport by Agent Lawrence G. Cincotta of the Federal Bureau of Investigation.  Tr. Vol. VI, p. 1498.  That knife had dried blood and hair on the blade and handle.  Tr. Vol. VI, p. 1527. The acrylic fibers taken from this knife were consistent with clothing worn by two victims, Jerri Bowles and Kay Bruno.  Tr. Vol. VI, p. 1528.  Federal Bureau of Investigation agent William Eubanks testified that the blood on the knife from the bank could have come from Ms. Bruno.  Tr. Vol. VI, p. 1539.  Agent Eubanks testified that the knife from the bank had a clean blade, and that the blood for his testing was taken from the handle area.  Tr. Vol. VI, p. 1540-41.  He testified that blood on the knife found in the car was consistent with that of the victims Bowles and Bruno.  Tr. Vol. VI, p. 1538.

On examination of the medical examiner, Richard Boatsman, M.D., Petitioner's counsel asked whether Dr. Boatsman had testified in Petitioner's first trial that he inserted the knife found at the bank, the knife with the clean blade, into one of the bodies, thereby contaminating it with the blood of a victim.  Dr. Boatsman indicated that although his testimony at the first trial could be interpreted in such a manner, that he

had never inserted the blade of the second knife into the body of any victim, always using probes designed for such work.  Tr. Vol. VI, p. 1748-49.

Agent Richard Goss of the Oklahoma State Bureau of Investigation testified at trial that Dr. Boatsman had a question about the knife during the autopsy, and that Agent Bentz produced the knife that was retrieved from the bank.  Tr. Vol. VI, p. 1707.  "Mr Bentz removed the knife . . . held it across the room, just removed it from the envelope and held it up.  Dr. Boatsman looked at the knife and drew a conclusion from whatever he saw and Mr. Bentz replaced the knife back in the envelope and removed it from the room."  Tr, Vol. VI, p. 1707.  According to Agent Goss' testimony, only Agent Bentz handled the knife during the autopsy.  Tr. Vol. VI, p. 1708.  Petitioner's allegation that Dr. Boatsman inserted the knife into Ms. Bruno's body is not supported by the condition of the knife, because there is no testimony by any witness that there was any blood on the blade.  All of the testimony indicates that there was blood on the handle of the knife, which was consistent with its condition when first found at the Bank.  This evidence considered in its entirety supports the Oklahoma Court of Criminal Appeals' conclusion that the State established that the knife was in substantially the same condition at trial as when recovered at the bank.  Petitioner has not presented any evidence to rebut the State's findings and the undersigned is unable to conclude that Petitioner was prejudiced by introduction of a knife in substantially the same condition as when it was found.

As for the testimony of Dr. Boatsman and its alleged inconsistences from the first trial, the jury was provided with an opportunity to view Dr. Boatsman and with the information regarding his prior testimony and his explanation thereof.  Charged with

assessing credibility, the jury apparently chose to believe Dr. Boatsman's testimony that he did not utilize a knife to probe the wound, but rather used a probe intended for that purpose as he has done in the past.  Tr. Vol. VI, p. 1753-54.  Because Petitioner has failed to establish that introduction of the knife found at the scene of the robbery and murders rendered his trial fundamentally unfair so as to result in the denial of due process, the undersigned recommends that habeas corpus relief be denied on Ground Seven.

### H.  GROUND EIGHT

In Ground Eight, Petitioner argues that prosecutorial misconduct and an inconsistent position taken by the prosecutor at his trial relative to a position adopted by the State at Mr. Neill's trial violated his due process rights.  Petition, p. 58.  Specifically Petitioner contends that the prosecutor used the same sketch in each trial, representing that it was a composite sketch of the person currently facing charges, when clearly the picture more closely resembled Mr. Neill.  Petitioner also complains that the prosecutor removed a photograph of Mr. Neill that had been attached to the sketch prior to introducing the sketch in Petitioner's trial.

On direct appeal, the Oklahoma Court of Criminal Appeals' discussion included the following:

> The record shows that Bellen Robles testified she had given investigators a description of the person she saw inside the Bank and based upon that description a composite drawing was made.  Arnold Bentz . . . testified he took the information from Mrs. Robles and drew the composite sketch.  The prosecutor moved to introduce the composite drawing as State's Exhibit No. 39.  Defense counsel objected, arguing that when the exhibit was shown to the witness, a photograph of Neill was attached to the corner.  However, the prosecutor had just removed the photograph and therefore improperly modified the exhibit.  The trial court inquired of defense counsel whether he had any knowledge that the witness had placed the photograph on the

> drawing or whether he in any way caused the exhibit to be in that
> condition. Defense counsel responded in the negative, and the trial court
> overruled the objection.

Opinion, p. 32. The Oklahoma Court of Criminal Appeals then concluded that Petitioner

failed to establish that the drawing was used in an inconsistent manner in Mr. Neill's

trial. Opinion, p. 33. The Court further noted that the record was silent as to who

attached the photograph of Mr. Neill to the composite drawing. Opinion, p. 33.

> What the record does show is that the prosecutor argued that the composite
> drawing could resemble either [Petitioner] or Neill. Any inconsistency in
> this argument was cleared up by Bellen Robles (sic) testimony that she
> identified Neill as the person she saw in the Bank, and that she identified
> Neill as the person in the composite drawing. Any error in the prosecutor's
> argument did not influence the verdict, when considered in light of the
> evidence against [Petitioner].

Opinion, p. 33 (citation omitted). "[N]ot every trial error or infirmity which might call

for application of supervisory powers correspondingly constitutes a failure to observe that

fundamental fairness essential to the very concept of justice." Donnelly, 416 U.S. at 642

(internal quotation marks omitted). As noted above, Petitioner is entitled to relief only

if the prosecutor's conduct rendered his trial fundamentally unfair in light of the totality

of the case.

In support of this contention Petitioner relies on cases that are factually

distinguishable. In Miller v. Pate, 386 U.S. 1 (1967), the state prisoner was granted

habeas corpus relief when the crucial physical evidence, shorts allegedly stained with

blood, were proven to be stained with paint. Id. at 5. It was further established that the

prosecutor knew at the time of the petitioner's trial the stains were paint not blood, but

he nevertheless permitted a chemist to offer false testimony that the blood on the shorts

matched the victim's blood-type.  Id. at 6.  Because the prosecution's entire case depended on the prosecution's misrepresentation, the Supreme Court concluded that the petitioner was entitled to habeas corpus relief

In United States v. Bakshinian, 65 F.Supp.2d 1104 (C.D.Cal. 1999), the defendant filed a motion in limine to preclude the government from making an argument inconsistent with the position it had taken at a prior trial of an alleged co-conspirator, where the government argued that Mr. Bakshinian was used by his alleged co-conspirator.  Id. at 1105.  In Petitioner's case, however, the photograph was not used in Mr. Neill's trial to exclude Petitioner as a perpetrator.  The State never argued that Mr. Neill acted alone with regard to the robbery and murders.  Accordingly, Bakshinian does not provide a basis for habeas corpus relief.

Petitioner also relies on United States v. Kattar, 840 F.2d 118, 127-28 (1st Cir. 1988).  The Court in Kattar criticized the government for arguing in Kattar's prosecution that the Church of Scientology was a virtuous organization, when in fact the government had previously alleged illegal conduct by the church.  Nevertheless, the Court did not find constitutional error.  None of these cases provides Petitioner with a basis for habeas corpus relief.

In this case, the prosecution never waivered in its theory that Mr. Neill and Petitioner committed the crimes together.  The prosecutor argued consistently throughout the trial, despite Bellen Robles' testimony, that the sketch could be Petitioner or Mr. Neill.[8]  Tr. Vol. VII, p. 1948-52, Vol. VIII, p. 2230-31, 2366-67.  Petitioner was cross-

---

[8] Bellen Robles assisted in the creation of the sketch and identified Mr. Neill as the person who shot her in the bank.

examined by the State regarding his appearance at the time of the robbery, admitting that like the sketch, he had straight hair while Mr. Neill had some curl, and that they had similarly-colored blond hair in December 1984.   Tr. Vol. VII, p. 1947-51.   In fact, Petitioner seemed to agree with the prosecutor that the sketch more closely fit him than Mr. Neill as to height, weight, approximate age, color of hair and length of hair but more closely fit Mr. Neill as far as the glasses were concerned.   Tr. Vol VII, p. 1949-52. Petitioner has not established that there was any misrepresentation by the State that would constitute prosecutorial misconduct.   Furthermore, to the extent Petitioner is arguing that he was prejudiced because the jury was not permitted to view the sketch with the attached photograph, his claim fails because he presented that exhibit to the jury.  Tr. Vol. VIII, p. 2230.  When Petitioner identified the exhibit he noted that it had a photograph of Mr. Neill attached thereto, and he testified the prosecutor removed the photograph during the trial.  Tr. Vol. VIII, p. 2230.  This exhibit was introduced without objection from the State.  Tr. Vol. VIII, p. 2230-31.  The jurors had the benefit of seeing both versions of the sketch, thereby reducing any negative impact that the State's version may have created.  Finally, the conviction in this case was not dependent on the State's introduction of the sketch, either with or without the photograph, and the prosecutor's actions did not render the trial fundamentally unfair.  Petitioner has not established that the decision of the Oklahoma Court of Criminal Appeals was contrary to or an unreasonable application of clearly established Supreme Court law or that the Oklahoma Court of Criminal Appeals' factual conclusions were unreasonable in light of the

evidence presented. Accordingly, the undersigned recommends that habeas corpus relief be denied on Ground Eight.

## I. GROUND NINE

In Ground Nine, Petitioner contends that he was deprived of due process by various instances of prosecutorial misconduct. The Oklahoma Court of Criminal Appeals denied relief with regard to each of his claims as will be set forth more specifically herein, except for the Petitioner's claim regarding the time trials, which was not addressed by the Oklahoma Court of Criminal Appeals.

### 1. Herman Williams' Testimony

The prosecutor introduced the testimony of a convicted felon, who testified that Petitioner had confessed to him while both men were held in the Comanche County Jail in August 1988. Following an in camera hearing on the admissibility of Herman Williams' testimony, the trial court concluded that it was admissible, with the jury to determine the weight of the evidence and its credibility. Tr. Vol. VI, p. 1619-1633.

In addressing this issue, the Oklahoma Court of Criminal Appeals concluded that Petitioner failed to establish that the State knowingly used false testimony. Opinion, p. 38. The Oklahoma Court of Criminal Appeals further noted that Mr. Williams' criminal history was introduced to the jury and was the subject of intense cross-examination by Petitioner's counsel. Therefore, the Oklahoma Court of Criminal Appeals denied relief. Opinion, p. 38. Petitioner contends this decision was incorrect because Mr. Williams' testimony was incredible on its face and Mr. Williams was clearly seeking assistance from the prosecutor in future parole proceedings. Petitioner further contends that Mr.

Williams' testimony was necessarily false, because on re-direct, Mr. Williams testified as follows:

> There was one item he was telling me about supposedly some evidence from him about an FBI agent and he had some paperwork there and he showed me a copy of what -- that he had ascertained supposedly to prove that this FBI agent had withheld evidence.

Tr. Vol. VI, p. 1672.  According to Petitioner, this testimony is in reference to a Freedom of Information Act request that Petitioner filed, which was not filed until the fall of 1989, one year after Mr. Williams' alleged conversation with Petitioner.

The prosecution may not deliberately deceive the court or jury by presenting false testimony.  See Mooney v. Holohan, 294 U.S. 103, 112 (1935).  Petitioner bears the burden of proving that the prosecutor knowingly presented false testimony.  See Smith v. Gibson, 197 F.3d 454, 460 (10th Cir.1999).  Before perjured testimony can provide grounds for the vacation of a conviction, the petitioner must establish that the testimony was false, that it was material, and that it was knowingly and intentionally used by the government to obtain a conviction.  McBride v. United States, 446 F.2d 229, 232 (10th Cir. 1971).  While the prosecutor knew that Mr. Williams had been convicted of suborning perjury and conspiracy to commit perjury in the past, there is no evidence that he knew that Mr. Williams testified falsely in Petitioner's case, or that Mr. Williams actually did testify falsely.  Petitioner simply alleges that Mr. Williams' testimony was necessarily false because there were bases for challenging his veracity.

Contrary to Petitioner's assertion, Mr. Williams' testimony at Volume VI, page 1672 does not establish that the prosecutor knowingly used perjured testimony.  The testimony itself does not provide any basis for identifying the documents referenced by Mr.

Williams as emanating from Petitioner's 1989 Freedom of Information Act request, nor did Petitioner seek an evidentiary hearing before the state courts.  There is insufficient evidence to conclude that Mr. Williams' testimony was perjury or that the prosecution knowingly used perjured testimony based on Mr. Williams' trial testimony.  Petitioner has failed to establish that the Oklahoma Court of Criminal Appeals' decision in this regard was contrary to or an unreasonable application of federal law, and accordingly, Petitioner is not entitled to habeas corpus relief.

The undersigned also notes that Petitioner's reliance on Ortega v. Duncan 333 F.3d 102 (2nd Cir. 2003), is misplaced.  Therein, the serial perjurer had recanted the testimony he had given at the petitioner's trial.  No such recantation has been produced in this case, nor is there any evidence that the prosecutor knew the testimony given by Mr. Williams was false, his history of suborning perjury notwithstanding.  The issues raised by Petitioner, including Mr. Williams' prior convictions for suborning perjury and for conspiracy to commit perjury go to the weight and credibility of his testimony.  Mr. Williams' criminal record, including his prior convictions for suborning perjury and for conspiracy to commit perjury and the assistance he had received from the State were before the jurors for their consideration in assessing his credibility.  Tr. Vol. VI, p. 1643-45, 1650, 1658-59, 1664-67, 1674.  Petitioner was permitted to establish that the same prosecutor in his case had obtained convictions against Mr. Williams for conspiracy to commit perjury and suborning perjury.  Tr. Vol. VI, p. 1666-67.  None of this information, however establishes perjury in this case, and  Petitioner's unsupported assertion that Mr. Williams was induced to offer false testimony in exchange for support in obtaining parole

does not entitle him to habeas corpus relief.  The undersigned recommends that habeas corpus relief be denied on this claim.

### 2.  Mathematically Impossible Time Trials

Petitioner argues that the prosecutor deprived him of a fair trial by introducing mathematically impossible time trials.  Respondent contends that this issue was not exhausted by Petitioner.  The argument concerning time trials was presented as what appears to be an afterthought in Petitioner's direct appeal brief: The entire argument is set forth herein:

> For the same reasons, the prosecution's introduction of the mathematically impossible time trials was improper and deprived Mr. Johnson of a fair trial and due process.  The case should be reversed on this ground as well.

Direct Appeal Brief, p. 44.  Petitioner addressed the issue in his reply brief on direct appeal by noting that the "state also does not dispute that, in an effort to discredit Mr. Johnson's alibi, the prosecution offered evidence of time trials that were mathematically impossible."  Reply, p. 10.  The decision by the Oklahoma Court of Criminal Appeals in Petitioner's direct appeal does not address the issue in any manner, leading to Respondent's argument that the claim is not exhausted as required by 28 U.S.C. § 2254(b)(1)(A).

In this circuit, a habeas petitioner satisfies the exhaustion requirement by showing either (1) "that a state appellate court has had the opportunity to rule on the same claim presented in federal court," or (2) "that at the time he filed his federal petition, he had no available state avenue of redress."  Miranda v. Cooper, 967 F.2d 392, 398 (10th Cir. 1992). The exhaustion requirement is satisfied "once [a] federal claim has been *fairly presented*

41

to the state courts." <u>Castille v. Peoples</u>, 489 U.S. 346, 351 (1989)(emphasis in original)(quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)).

The lack of factual and legal development in Petitioner's direct appeal brief to the Oklahoma Court of Criminal Appeals leads to the conclusion that Petitioner has not exhausted this claim.  In <u>Picard</u>, the Supreme Court held "that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." <u>Gray v. Netherland</u>, 518 U.S. 152, 162-63 (1996).  Petitioner's two sentences in his opening brief on direct appeal were insufficient to squarely present the claim to the Oklahoma Court of Criminal Appeals, especially in the absence of any factual development or citation to federal authorities.  Accordingly, the undersigned concludes that this claim was not exhausted.  The impact of Petitioner's failure to exhaust this claim is irrelevant, because he is not entitled to relief on the merits of the claim.  28 U.S.C. § 2254(b)(2).

The State's theory was that Petitioner was actually present at the bank during the robbery and murders.  As noted, Ms. Ward, one of Petitioner's neighbors, placed him at the apartment complex on the day of the robbery and murders, sometime around 1:00 p.m., maybe a few minutes before or a few minutes afterwards.  The State attempted to show through various witnesses that Petitioner had time to travel to the bank and commit the robbery and murders, which occurred between 1:15 p.m. and 1:30 p.m.  For example, one witness for the State testified that she lived near the apartment complex in which the Petitioner lived and she drove to the bank twice a day since April 1983, and it took her

anywhere from 10 to 20 minutes to make the drive, depending on how fast she drove. Tr. Vol. IV, p. 1049-50.  An FBI agent testified that he drove the route from the apartment complex to the bank several times, with his fastest time being 18 minutes and 52 seconds and his slowest time being 23 minutes, observing speed limits and traffic signs.  Tr. Vol. VI, p. 1545.

To counter this testimony, Petitioner offered the testimony of an assistant professor of mathematics from Cameron University to testify that based strictly on mathematical computations, it would not be possible for a person to drive from Petitioner's apartment complex to the bank in the time testified to by the State's witnesses.  Tr. Vol. VII, p. 1781-1800.  In addition, a video producer and a private investigator testified to time trials they ran, driving from the apartment complex to the bank.  Tr. Vol. VII, p. 1819-24, 1832-42.

The jury was instructed that its task was to weigh the credibility of the witnesses in assessing Petitioner's guilt. Instruction No. 3, Original Record, p. 2905-07.  Both sides presented their evidence as to how long it would take to drive from the apartment complex to the bank, and the jurors were free to weigh the conflicting testimony in determining whether any of the time trials were reliable.

Furthermore, the dispute over the amount of time it took to drive the route was really fairly insignificant, when considered in the context of all of the testimony.  For example, the two witnesses who placed Petitioner at the apartment complex prior to the bank robbery/murders estimated that Petitioner was last seen by them at approximately 12:50 - 12:55 p.m. to as late as one to two minutes after 1:00 p.m., a difference of as much

43

as twelve minutes.  Tr. Vol. V, p. 1203, 1210, 1427, 1435, 1438.  The exact time of the bank robbery/murders was not established, but the robbery/murders were estimated to have occurred around 1:15 to 1:30 p.m.  The above times were all estimates and certainly the witness' clocks/watches could have been off several minutes.  The State's evidence as to time trials was almost 19 minutes, while Petitioner's witnesses testified that their time trials were around 20 minutes, a difference of only about one minute.  Tr. Vol VI, p. 1545; Tr. Vol VII, p. 1824, 1837-41.[9]  Petitioner has not established either that the trials were impossible or that the prosecutor knew they were impossible.  Finally, as noted above, Petitioner's presence at the bank during the robbery and murders was not necessary to support a finding of guilt in light of the substantial evidence of his participation in the planning of the robbery and the procurement of the weapons.  Accordingly, the undersigned recommends that habeas corpus relief be denied on this claim.

### 3.  Marilyn Roach's Testimony

Petitioner also argues that his due process rights were violated by the testimony of Marilyn Roach, who was injured during the robbery when she was shot in the head.  Ms. Roach testified that she heard the voices of two robbers.  Tr. Vol. V, p.  1356.  Specifically, the following questions were asked and answers given on direct examination:

Q: After the shooting stopped did you hear anything:
    A: Yes.
    Q: What, if anything, did you hear?

[9]Some of Petitioner's time trials took longer and some took less than 20 minutes.

> A: Someone said I thought I told you not to shoot anybody. He was very upset.  And he answered -- says well they moved.  So ---.
> Q: Was there two different voices?
> A: Yes.

Tr. Vol. V, p. 1355-56.  On cross-examination, the following exchange took place:

> Q: Ms. Roach, except for the conversation that you say you heard that took place behind you as you lay there on the floor in that room there was nothing else that led you to believe there was more than one robber in that bank was there?
> A: Yes, because when I was praying laying there seeking the lord he spoke to me and said forgive them for -- forgive them. They need the same grace and blessing that you receive and I remember why the spirit of the lord said forgive them.

Tr. Vol. V, p. 1362-63.

Petitioner contends that because the untrustworthiness of the testimony is obvious and because no other person in the bank heard the conversation, the conclusion contained in a report by an agent of the Federal Bureau of Investigation that Ms. Roach was hallucinating was the only explanation.  Petitioner argues that because the testimony was clearly the result of hallucination, that the trial court should not have permitted Ms. Roach to testify.[10]

The Oklahoma Court of Criminal Appeals considered Petitioner's argument and concluded:

> Appellant fails to cite any legal authority to support his allegations. Absent plain error we will not address assertions unsupported by legal authority.  Romano v. State, 909 P.2d 92, 117 (Okla Cr. 1995), cert. denied, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996).

---

[10] The report of the agent was apparently included in the original record but not introduced at trial. Opinion, p. 39.

> Every person is competent to be a witness except as otherwise provided in the Oklahoma Evidence Code. 12 O.S. 1981, § 2601. A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. 12 O.S. 1981, § 2602. Evidence to prove personal knowledge may consist of the witness's own testimony. Id.

Opinion, p. 39-40. The Court continued by concluding that Ms. Roach had personal knowledge and that the "weight and credibility of her testimony was exclusively for the jury's determination." Id. at 40. Finding no plain error in the admission of the testimony, the Oklahoma Court of Criminal Appeals denied relief.

Again, the arguments by Petitioner go to the weight and credibility of Ms. Roach's testimony, not to its admissibility. Pursuant to Oklahoma law, Ms. Roach's statements were fully admissible, and this Court is not free to reconsider the Oklahoma Court of Criminal Appeals' decision with regard to Oklahoma law. Additionally, although Petitioner argues that Ms. Roach's testimony was patently incredible, he presents no evidence other than his speculation that her testimony was false and that the prosecution knew the testimony to be false. Ms. Roach consistently maintained that she heard two voices, even when she was being removed from the bank on a stretcher. Dr. Ingalls, who treated Ms. Roach at the hospital, testified that she was alert and responsive, and that her hearing and memory would have been intact despite her injury. Tr. Vol. VI, p. 1760-62, 1765. Defense counsel was free to argue that Ms. Roach's testimony was the result of a hallucination and to support this argument with the fact that none of the other survivors heard the conversation. Additionally, if the testimony was as absurd as Petitioner paints it to have been, surely the jury would not have attached significant weight to the testimony. However, because Ms. Roach was a competent witness the issue of her

46

credibility was for the jury, and Petitioner is not entitled to habeas corpus relief.  Finally, as noted throughout, Petitioner's conviction did not require his physical presence at the bank during the robbery.  Accordingly, the undersigned recommends that habeas corpus relief be denied on this claim.

For the reasons set forth above, the undersigned recommends that habeas corpus relief be denied on Petitioner's Ground Nine.

### J.  GROUND TEN

In Ground Ten, Petitioner argues that one-sided indefensible evidentiary rulings deprived him of a fair trial.  In this section he specifically objects to four rulings by the trial court, each of which is subject to evaluation under the same fundamental fairness standard, set forth above at Ground Seven.

State court rulings on evidentiary matters are issues of state law, which generally may not be challenged on habeas corpus.  See Martin v. Kaiser, 907 F.2d 931, 934 (10th Cir. 1990)(error in admission of evidence is generally a matter of state law not cognizable on habeas corpus).  Rather, "[s]tate court rulings on the admissibility of evidence may not be questioned in federal habeas proceedings unless they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights."  Brinlee v. Crisp, 608 F.2d 839, 850 (10th Cir. 1979)(citing Gillihan v. Rodriguez, 551 F.2d 1182, 1192-93 (10th Cir. 1980)).

### 1.  Post-Robbery Cocaine Usage

Petitioner argues that the evidence that he and Mr. Neill used cocaine in the days between the robbery and their apprehension denied him a fair trial.  Petitioner raised this issue on direct appeal and the Oklahoma Court of Criminal Appeals concluded:

> This identical issue was raised by Neill in his direct appeal.  In rejecting Neill's claim of error, this Court found the evidence properly admitted as "evidence of the events occurring in San Francisco were so closely related to the bank robbery and murders that they formed a logical connection with the charged offenses so as to be relevant evidence."  896 P.2d at 551.

Opinion, p. 26.  The Oklahoma Court of Criminal Appeals noted that both Petitioner and Neill received notice of the State's intention to use this Rule 404(b)-type evidence, and concluded that the cocaine usage was indicative of how the proceeds of the robbery were utilized.  Opinion, p. 27.  In addition, the Court noted that the jury was instructed as to the limited use of the evidence.  Id.

Petitioner has failed to establish that the introduction of the evidence regarding his cocaine usage in San Francisco rendered his trial fundamentally unfair.  The jury in Petitioner's case was instructed on how the evidence should be used, and the jury is presumed to have followed these instructions.[11]  Weeks v. Angelone, 528 U.S. 225, 234

---

[11] As noted by the Oklahoma Court of Criminal Appeals, Instruction No. 34 to the jury provided:

> Evidence has been received that the defendant has allegedly committed offenses other than that charged in the information.  You may not consider this evidence as proof of the guilt or innocence of the defendant of the specific offense charged in the information.  This evidence has been received solely on the issue of the defendant's alleged motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident.  This evidence is to be considered by you only for the limited purpose for which it was received.

(O.R. 2940), Opinion, p. 27, n. 5.

(2000).  Furthermore, "[e]vidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions."  Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir.1991).  Only if there were no permissible inferences that the jury could draw from the evidence would its admission have violated Petitioner's due process rights.  Id.  Because there was a permissible inference, Petitioner's motive for the robbery, his knowledge thereof, and tracing the proceeds from the robbery, Petitioner's due process rights were not violated by introduction of his post-robbery drug usage and habeas corpus relief should be denied on this claim.

### 2.  Letters to Paul Dunn

Petitioner also argues that he was denied a fair trial by admission of statements he made in letters to Dr. Paul Dunn, a man who contacted Petitioner in prison and told him that he wanted to write a book about the murders.  Petitioner was subject to cross-examination regarding the letters by the State.  Petitioner contends that the statements he made in the letters were inflammatory, prejudicial, and not even arguably probative of any legitimate issue in the case.  Petition, p. 71.

On direct appeal, the Oklahoma Court of Criminal Appeals held as follows:

> [Petitioner's] defense was that he did not participate in the robbery/homicides and was unaware of Neill's plans to rob the Bank. [Petitioner] also testified that he had a "horrible" childhood, that he was abused by his stepfather, and that he watched his stepfather abuse his mother, which resulted in his passive nature.

> To rebut that defense, the prosecutor introduced statements [Petitioner] had made in his letters to Mr. Dunn.  In these letters, [Petitioner] attempted to elicit money for his accounting of the robbery/homicides. [Petitioner] said in part, "I know I have a good story and

49

> I know it will make a great book/movie.  I'm just waiting for a reasonable financial opportunity.  I feel it's only fair, I'm eager and ready."

Opinion, p. 28-29.  The Court concluded that Petitioner was not deprived of a fair trial because the questions he was called upon to answer on cross-examination tended to elucidate, modify, explain, contradict, or rebut Petitioner's direct testimony.

At trial Petitioner testified on direct that he had a very unhappy childhood and counsel argued that as a result of an abusive childhood Petitioner was subject to being controlled by Mr. Neill.  Petitioner's letters to Paul Dunn were fully admissible to discredit Petitioner's testimony, because in those letters Petitioner told Paul Dunn that his childhood was happy.[12]

Additionally, Petitioner's statements to Paul Dunn that he had a good story to tell and his desire to receive financial compensation for his story were probative of his credibility and his role in the robberies.  Although Petitioner was aware that he could not personally profit, he made arrangements for the money to go to his mother.  Tr. Vol. VII, p. 1960.

Petitioner complains about the decision to allow the State to introduce a portion of a letter where he referred to Oklahomans as hicks.  This was allegedly made to school counselors, when Petitioner sought help because people were calling him names.  Tr. Vol. VII, p. 1973.  Although he sought help for this issue, Petitioner never once mentioned the alleged abuse by his step-father to the counselor, again calling his credibility into question.  Finally, the letters included an attempt by Petitioner to place

---

[12] In a letter to Paul Dunn, Petitioner wrote, "I really enjoyed growing up.  I loved school.  I always looked forward to Mondays.  I guess I enjoyed learning."  Tr. Vol. VII, p. 1971.

the blame on Ruben Robles, one of the victims, by attributing the conversation overheard by Marilyn Roach to Mr. Neill and Mr. Robles.  Tr. Vol. VIII, p. 2184-88.  Petitioner testified at trial that any lies he included in his letters were statements made by Mr. Neill and passed to Petitioner by Petitioner's mother.  Tr. Vol. VIII, p. 2184-86.

Petitioner has not established that his admissions in his letters to Paul Dunn were prejudicial in light of his testimony or that the content of the letters was an improper subject for cross-examination.  Certain letters show an attempt to place the blame on Mr. Robles, a victim of the robbery.  The prosecution was entitled to utilize Petitioner's admissions to challenge the credibility of his testimony.  Furthermore, Petitioner was not precluded from showing that despite the potentially incriminating statements in his letters to Mr. Dunn that he maintained his innocence in the letters and that he did in fact complain about how his stepfather treated him.  The issue of Petitioner's credibility was fairly presented to the jury.  Because Petitioner has failed to establish that the letters rendered his trial fundamentally unfair, he is not entitled to habeas corpus relief on this claim.

### 3.  Crime Scene Photographs

Petitioner argues that he was deprived a fair trial by the admission of twenty-eight photographs of the victims and the crime scene.  Petition, p. 74.  Petitioner does not argue that the Oklahoma Court of Criminal Appeals' decision regarding the photographs was contrary to or an unreasonable application of clearly established federal law as enunciated by the Supreme Court, arguing instead that pursuant to Oklahoma case law admission of the photographs was error.

On habeas review, this Court considers only "whether the admission of the photographs rendered the proceedings fundamentally unfair." Smallwood, 191 F.3d at 1275. The fundamental fairness analysis is approached with "considerable self-restraint." Id. Although the photographs are graphic in that they depict the victims of the robbery prior to the start of the autopsy, those photos are not so repetitious as to be prejudicial. The pictures depict the size and location of the stab wounds. The photographs of victims in the bank depict the location of the bodies and are not gruesome in the legal sense. The victims' wounds are not readily identifiable in those photographs. The undersigned finds that the admission of the challenged photographs did not render Petitioner's trial fundamentally unfair. Therefore, the Oklahoma Court of Criminal Appeals' rejection of this claim was not unreasonable, and the undersigned recommends that habeas relief be denied

### 4. Petitioner's Expert Witness

Petitioner argues the trial court violated his right to a fair trial when it refused to permit his expert witness to testify whether it would have been possible to drive a four-cylinder car from Petitioner's apartment to the bank in seventeen minutes or less. Petition, p. 75. At trial Petitioner had Dub Armstrong, a private investigator and former police chief in El Reno, Oklahoma, testify about the time it took him to drive the route from the apartment complex to the bank. Petitioner's counsel then asked Mr. Armstrong:

> Chief Armstrong, based on your experience in law enforcement, based solely on your experience, could an automobile that has only four cylinders and 82 horsepower, would an automobile of that horsepower get from the Tanglewood Apartments to the Geronimo bank site in seventeen minutes or less?

Tr. Vol. VII, p. 1850.  The State objected, and the Court sustained the objection.  Tr. Vol. III, p. 1850.  Because the Court would not allow the opinion, Petitioner's counsel proffered that Mr. Armstrong would, if permitted, testify that it would not have been possible to drive the route in a four cylinder 82 horsepower car in 17 minutes and 18 seconds.  Tr. Vol. VIII, p. 1851.  In considering this claim, the Oklahoma Court of Criminal Appeals noted that Mr. Armstrong had conducted time trials between the apartment where Petitioner and Mr. Neill lived and the bank, driving three different routes three or four times each.  Opinion, p. 21.  The Court concluded that Mr. Armstrong was not properly qualified as an expert under Oklahoma law.  Opinion, p. 23.

> His experience in law enforcement was not sufficient to qualify him to render an expert opinion on whether a certain type of car could drive a particular route in a specified amount of time.  No evidence of facts or data of a type reasonably relied upon by experts in the field of accident reconstruction was offered.  Armstrong's experience in driving the routes several times was sufficient to support his personal opinion, but insufficient to support an opinion as an expert.

Opinion, p. 23.

The right of a criminal defendant to offer testimony is grounded in the Sixth Amendment.  Taylor v. Illinois, 484 U.S. 400, 408-409 (1988).  Defendants generally have the right to present "competent, reliable ... evidence."  Crane v. Kentucky, 476 U.S. 683, 690 (1986).  However, this right to present evidence "is not unlimited, but rather, is subject to reasonable restrictions."  United States v. Scheffer, 523 U.S. 303, 308 (1998).  A defendant's interest in presenting such evidence may "bow to accommodate other legitimate interests in the criminal trial process."  Rock v. Arkansas, 483 U.S. 44, 55 (1987).  Additionally, in presenting testimony a criminal defendant must comply with

53

established rules of evidence and procedure as required by the state "to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers v. Mississippi, 410 U.S. 284, 302 (1973). As a result, state and federal rule makers have a broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Scheffer, 523 U.S. at 308.

In Morris v. Burnett, 319 F.3d 1254 (10th Cir. 2003), the Tenth Circuit considered the Supreme Court decision in Scheffer. The Tenth Circuit noted that the Supreme Court concluded in Scheffer that the exclusion of polygraph evidence did not violate the petitioner's Sixth Amendment rights because exclusion of the evidence did "not implicate any significant interest of the accused." Id. at 1275 (quoting Scheffer, 523 U.S. at 316-17). Secondly, the reliability of the evidence was questionable. Id. at 1275 (citing Scheffer, 523 U.S. at 309-12).

At first blush it would appear that Petitioner had "significant interest" in the excluded testimony. However, "[t]he discussion in Scheffer . . . indicates that the 'significant interest' of concern is the right to put on factual evidence." Id. at 1275. Petitioner was not precluded from offering evidence as to how long it took for his witnesses to drive from the apartment complex to the bank. As noted above, Mr. Armstrong was allowed to testify about the time trials that he conducted and about how long it actually took him to drive the routes between the apartment and the bank.[13] Mr.

---

[13] Petitioner contends that the State was permitted to have a witness testify about the time in which it would have taken a person to drive from Petitioner's apartment to the bank. Petitioner cites to the transcript, Vol. IV, p. 1050, in support of this contention. At that page Marie Cork, a fact witness, was asked how long it took her to get from her apartment across from the complex where Petitioner lived to the bank. Contrary to Petitioner's assertion, she was not offering an opinion, but rather was testifying regarding a personal experience.

Armstrong was only precluded from giving his "expert" opinion because the trial court concluded that he lacked the necessary expertise to support such an opinion.  As in Scheffer, the reliability of the evidence is in question.  Because Petitioner's "significant interest" was not implicated by the Court's exclusion of this particular opinion of Mr. Armstrong, Petitioner is not entitled to habeas corpus relief on this claim.

Petitioner's contention that the limitation violated his due process rights is without merit as well.  The decision of the Oklahoma Court of Criminal Appeals that Mr. Armstrong was not qualified as an expert to testify to the opinion was an issue of state law.  The limitation imposed on his testimony was by virtue of the limitation on his qualifications, a factual finding entitled to deference.  There was no evidence that Mr. Armstrong was qualified to testify about the ability of a particular car to complete the route in the absence of evidence of particularized knowledge about particular-sized engines.  The excluded testimony has greater scientific implications in light of counsel's attempt to have him testify about the capacity of a car of a certain engine size. Accordingly, even if construed under the due process clause, Petitioner has not established that his rights were violated.  Accordingly, the undersigned recommends that habeas corpus relief be denied on Ground Ten.

### K.  GROUND ELEVEN

In Ground Eleven, Petitioner argues that he was denied a fair trial and an impartial jury when a juror opposed to conviction was targeted for investigation and removed from the jury during his sentencing proceedings.  Petitioner alleges that Karen Nobis, a juror not favorable to the State's case, was removed from the jury following the deliberations

in the guilt phase of his trial and following opening statements and the testimony of two witnesses during the penalty phase of trial.  Petition, p. 79.[14]

On direct appeal, the Oklahoma Court of Criminal Appeals considered the case under Oklahoma law, because Petitioner had cited to a single case regarding the confidential nature of jury deliberations.  Order, p. 41 (citing United States v. Olano, 507 U.S. 725, 737 (1993)).  Olano, however, dealt with permitting alternate jurors to be present without participating during deliberations and the taint their presence could have on the jury.  This, however, was not an issue raised by Petitioner.  The Oklahoma Court of Criminal Appeals concluded that the trial judge's decision to exclude the juror based on her *voir dire* responses and her conversation with her mother-in-law was proper under Oklahoma law.

The Oklahoma Court of Criminal Appeals concluded that the removal of the juror clearly did not impact the guilt stage of Petitioner's trial.  Opinion, p. 46.  The Oklahoma Court of Criminal Appeals further concluded that because Petitioner was not sentenced to death despite the jury's finding of three aggravators, that Petitioner could not establish that he was prejudiced by Ms. Nobis' removal.  Opinion, p. 46.  The Oklahoma Court of Criminal Appeals also noted from the record that the trial judge concluded that Petitioner's counsel stood outside the jury deliberation room door longer than the prosecutor, leaving Petitioner hard pressed to argue that he is entitled to relief because of the prosecutor's actions.  Opinion, p. 47, note 7.

_____

[14]Petitioner contends in his reply brief that juror Nobis was heard saying during jury deliberations that she would not find Petitioner guilty of first degree murder.  Reply Brief, p. 40.  Clearly, she did find Petitioner guilty of first degree murder as she was not removed from the jury until the penalty phase of the trial.

After the jury returned a verdict of guilty against the Petitioner, the prosecutor realized that one of the jurors had paid little attention to the final witnesses or to closing arguments.  Tr. Vol. IX, p. 2565.  Curious as to why, the prosecutor sought additional information about the juror, Ms. Nobis.  Tr. Vol. IX, p. 2565-66.  The prosecutor obtained a reading of Ms. Nobis' *voir dire* from the court reporter, which indicated that Ms. Nobis had been represented by Petitioner's original trial counsel as part of an earlier divorce proceeding.  Tr. Vol. IX, p. 2568.  After reviewing the divorce file, the prosecutor believed that Ms. Nobis had not been forthcoming and had misled the Court with her responses on *voir dire* that the attorney did not get involved in her case.  Tr. Vol. IX, p. 2536, 2540, 2568.

The prosecutor received information from Ms. Nobis' mother-in-law, Evelyn Nobis, indicating that contrary to the judge's instructions Ms. Nobis had spoken about the case, commenting on the evidence, and indicating that jurors did not feel that the State had proven that Petitioner was in the bank and stating that he would likely receive a sentence less than death as punishment.  Tr. Vol. IX, p. 2552-53, 2555.

Petitioner contends that the prosecutor became concerned only after listening to the confidential jury deliberations from outside the door to the deliberation room.  The trial court acknowledged that both the prosecutor and defense counsel were present at the door, stating:

> Well, I noticed that you did not, Mr. Payne, [one of Petitioner's attorneys] and I can say that I saw Mr. Schulte [the prosecutor] there for a period of time early in deliberations. Mr. Barta [another of Petitioner's attorneys] was there most of the time during deliberations.

Tr. Vol. IX, p. 2583.   The Court concluded that Ms. Nobis was subject to removal primarily based on the fact that contrary to her answers during voir dire, Petitioner's prior trial counsel had represented her during the early stages of her divorce proceedings.   Tr. Vol. IX, p. 2587-88.

As noted, defense counsel was implicated by the trial judge as being present in the same location for much of the deliberations, and thus it is difficult to discern that Petitioner should benefit from an alleged interference with the jury undertaken by both sides in the case.   Furthermore, the record is devoid of any evidence that the prosecution obtained any knowledge by listening at the door of the jury deliberation room or that using this information resulted in interference with the jury that violated Petitioner's constitutional rights.   The prosecutor's unchallenged reason for seeking the juror's removal was from information he gained by watching her during the trial and by information he received from her mother-in-law. Finally, Petitioner fails to establish that in light of the facts set forth above, that the Oklahoma Court of Criminal Appeals' decision was contrary to or an unreasonable application of clearly established federal law.   This Court does not sit as a super-appellate court to offer direct review of the decisions of the Oklahoma Court of Criminal Appeals.   See Robinson v. State of Oklahoma, 404 F.Supp. 1168, 1170 (W.D. Okla. 1975).   The scope of habeas corpus review is tightly circumscribed, and Petitioner, being represented by counsel, should provide the Court with arguments based on Supreme Court authority to support habeas corpus relief under the standards set forth herein.   In the absence of any such authority, the undersigned concludes that the above cited facts preclude a finding that Petitioner

was prejudiced by Ms. Nobis' removal as a juror and recommends that habeas corpus relief be denied on Ground Eleven.

### L.  GROUND TWELVE

In Ground Twelve, Petitioner argues that he was deprived of his right to a fair trial because the trial court refused to instruct the jury that it could not attribute Mr. Neill's conduct to Petitioner in determining the appropriate sentence.  Petition, p 82.  In considering this claim on direct appeal, the Oklahoma Court of Criminal Appeals noted that Petitioner's only citation was to Lockett v. Ohio, 438 U.S. 586 (1978).  The Oklahoma Court of Criminal Appeals concluded that Lockett did not apply in cases where the jury chooses a punishment less than death.  Opinion, p. 47.  The Oklahoma Court of Criminal Appeals further noted that the specific instruction sought by Petitioner applied only to the death penalty because Petitioner specifically requested that the jury be instructed that it could not attribute Mr. Neill's actions to Petitioner in the event they found Mr. Neill's conduct to be heinous, atrocious and cruel, one of the statutory aggravating circumstances for imposition of the death penalty.  Opinion, p. 47.

Petitioner contends that Lockett necessarily applies in all cases where the death penalty is an option for the jury.  The undersigned disagrees.  In Lockett, the Supreme Court noted the following:

> Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases.  The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases. A variety of flexible techniques--probation, parole, work furloughs, to name a few--and various postconviction remedies may be available to modify an initial sentence of confinement in noncapital cases.  The nonavailability of

> corrective or modifying mechanisms with respect to an executed capital
> sentence underscores the need for individualized consideration as a
> constitutional requirement in <u>imposing</u> the death sentence.

<u>Lockett v. Ohio</u>, 438 U.S. 586,605 (1978)(emphasis added).  The Supreme Court's focus

in <u>Lockett</u> was on the jury's ability to consider mitigating factors.  In this case clearly the

jury was not precluded from full consideration of the mitigating factors, because the

jurors concluded that the mitigating factors outweighed the aggravating factors and

imposed a sentence of less than death.  A subsequent Supreme Court decision supports

this interpretation of the  purpose of <u>Lockett</u>.

> In <u>Lockett</u>[,] ... Chief Justice BURGER, writing for the plurality, stated the
> rule that we apply today: "[W]e conclude that the Eighth and Fourteenth
> Amendments require that the sentencer ... not be precluded from
> considering, *as a mitigating factor*, any aspect of a defendant's character or
> record and any of the circumstances of the offense that the defendant
> proffers as a basis for a sentence less than death. <u>Id</u>. at 604, 98 S.Ct. at 2964
> (emphasis in original).

<u>Eddings v. Oklahoma</u>, 455 U.S. 104, 110 (1982).  This was so, because death by public

authority is "'profoundly different from all other penalties.'"  <u>Id</u>. (quoting <u>Lockett</u>, 438

U.S. at 605).  Although Petitioner argues that because death was an option for the jury

that the judge was required to give his requested instruction, as noted by the Oklahoma

Court of Criminal Appeals, the instruction became unnecessary once the jury imposed

a lesser sentence.  Accordingly, habeas corpus relief should be denied on Ground Twelve.

## M.  GROUND THIRTEEN

In Ground Thirteen, Petitioner argues that the State's improper closing argument

during the penalty phase deprived him of a fair trial.  Petition, p. 84.  Petitioner

complains about the following passage from the prosecutor's second phase closing argument:

> Bring your common sense to this case.  Any time you have a death, four deaths, four additional people shot, of this magnitude, and the individuals for what reason so that can take the money, hit the gay bars, party and do cocaine and go on a shopping spree in San Francisco . . .  And I pray that you're strong enough _ _ there is only one verdict _ _ to get up, go in that deliberation room, render your decision, make it unanimous.  Those of you that are strong on this jury work on the weak. . . .  Counsel wants one of you that is not strong enough to assess the death penalty and if he is able to get that then he saves this man's life . . . .  I pray you, I beseech you stay strong  . . . [H]old your head up high, you follow the law.  You were committed to your oath.

Tr. Vol. IX, p. 2777-78.  In rejecting his argument on appeal the Oklahoma Court of Criminal Appeals concluded that because Petitioner's counsel had only objected to the reference to the "weak," that all but plain error had been waived.  Opinion, p. 48.  The Oklahoma Court of Criminal Appeals further concluded that portions of the closing argument were proper because the State is permitted to comment on the evidence, and that it was not error for the prosecutor to emphasize to the jury its duty and to ask them to consider the punishment.  Opinion, p. 48.  Thus, the Oklahoma Court of Criminal Appeals concluded that the comments were not improper.  Opinion, p. 49.

Prosecutorial misconduct does not warrant federal habeas relief unless the conduct complained of "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643; see also Mahorney v. Wallman, 917 F.2d 469, 472 (10th Cir.1990). In evaluating whether improper prosecutorial comments render a trial fundamentally unfair, the comments are viewed in the context of the trial as a whole.  Duvall v. Reynolds, 139 F.3d 768, 794 (10th Cir. 1998)(citation omitted).

"[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" <u>Donnelly</u>, 416 U.S. at 642 (quoting <u>Lisenba v. California</u>, 314 U.S. 219, 236 (1941)).

The prosecutor's  comments were clearly directed at asking the jurors to render a unanimous death penalty verdict, which did not happen.  The prosecutor's argument included the following:

> And don't put that burden on your shoulders when you go back or when that foreman signs that verdict for death. This man has earned it.... It's not your fault four people were shot in the Geronimo Bank or that two people went to California and partied until they were caught. No. You're to apply the law to the facts and no other penalty fits. None. Beg you the death penalty. Make sure that all twelve of you so agree. Make sure you check the aggravating circumstances that apply, hold your head up high, you follow the law.

Tr. Vol. IX, p. 2778.  In the context of the entire trial, and in light of the jury's decision to render a verdict of life imprisonment without the possibility of parole, the undersigned cannot conclude that the prosecutor's closing argument rendered Petitioner's trial fundamentally unfair.  Petitioner has failed to establish that the decision of the Oklahoma Court of Criminal Appeals was contrary to or an unreasonable application of clearly established federal law, and accordingly, the undersigned recommends that habeas corpus relief be denied on Ground Thirteen.

## **RECOMMENDATION**

Having reviewed the record in this case and the parties' filings, the undersigned recommends that the petition for writ of habeas corpus be denied.  The parties are

advised of their right to file objections to this Report and Recommendation with the Clerk of this Court by April 21, 2006, in accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1.   The parties are further advised that failure to timely object to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein.   <u>Moore v. United States</u>, 950 F. 2d 656 (10th Cir. 1991).   This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter.

**ENTERED this 29th day of March, 2006.**

_____
DOYLE W. ARGO
UNITED STATES MAGISTRATE JUDGE